# Third District Court of Appeal

## State of Florida

Opinion filed October 2, 2024.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D22-2239, 3D22-2240 & 3D22-2241
Lower Tribunal Nos. 20-169-P, 20-226-P, 20-170-P
_____


**Incident365 Florida, LLC,**
Appellant,

vs.

**Ocean Pointe V Condominium Association, Inc., et al.,**
Appellees.


Appeals from the Circuit Court for Monroe County, Timothy J. Koenig, Judge.

Ferencik, Libanoff, Brandt, Bustamante & Goldstein, P.A., and Ira Libanoff (Plantation); and Buchanan, Ingersoll, & Rooney PC, and Hala Sandridge (Tampa), for appellant.

Abrams Law Firm, P.A., and Ryan A. Abrams (Fort Lauderdale); Scott J. Edwards, P.A., and Scott J. Edwards (Boca Raton), for appellees.

Shannin Law Firm, P.A., and Nicholas A. Shannin (Orlando), for the Restoration Industry Association, as amicus curiae.


Before SCALES, GORDO and LOBREE, JJ.

GORDO, J.

In these appeals, the plaintiff below, Incident365 Florida, LLC ("Incident"), appeals from separate final summary judgments entered in favor of Ocean Pointe III Condominium Association, Ocean Pointe IV Condominium Association and Ocean Pointe V Condominium Association (collectively, "Associations"). We have jurisdiction. Fla. R. App. P. 9.030(b)(1)(A). For the reasons that follow, we reverse and remand for further proceedings consistent with this opinion.

I.

The underlying action stems from several Service Agreements ("Agreements") that Incident, a disaster mitigation service company, entered into with each of the condominium associations following Hurricane Irma in 2017. Buildings and units within each condominium association sustained water intrusion during the storm. The Agreements listed seven specific "Disaster Recovery Tasks" that Incident would perform at the Associations' buildings: (1) water damage mitigation; (2) general dehumidification; (3) structural dehumidification; (4) structural removal of affected substrates; (5) disposal of removed materials off property location; (6) anti-microbial

2

application; and (7) mold remediation, as necessary.[1] Neither Incident, nor its agents, possessed a contractor's license when the Agreements were entered into or while the work was performed.

Following the execution of the Agreements, Incident began to perform work at the Associations' buildings. The scope of work completed by Incident, which amounted to approximately $1.4 million, included extracting water by placing removable machines within the buildings; laying plastic sheeting; removing unsalvageable drywall, ceiling materials, flooring (carpets and vinyl plank tiles), cabinetry, and popcorn texture on ceilings; providing and operating equipment to dry out wet building materials and units, including industrial grade fans, blowers and dehumidifiers; applying anti-microbial solutions on surfaces for sanitation; and disposing of removed materials.

After the Associations failed to remit the remaining balance due of approximately $1 million under the Agreements, Incident filed suit against each condominium association. Incident's operative complaints asserted four claims: (1) breach of contract, (2) open account, (3) account stated, and (4) unjust enrichment. In their answers and affirmative defenses, the

---

[1] It is undisputed that Incident did not ultimately provide any "mold remediation" services.

3

Associations raised numerous affirmative defenses, including unlicensed contracting under section 489.128, Florida Statutes, and unlicensed mold remediation under section 468.8419, Florida Statutes.

The Associations filed amended motions for summary judgment based on their affirmative defenses of unlicensed contracting and unlicensed mold remediation, asserting that each defense serves as a complete bar to recovery. Specifically, the Associations argued that Incident engaged in significant interior demolition and other disaster mitigation work throughout the Associations' buildings, "to repair and/or improve damage" without a contractor's license. As a result, the Associations argued Incident could not enforce the Agreements "in law or in equity" as an unlicensed contractor, as provided by section 489.128(1).

Incident argued in response that the work it completed does not require a contractor's license pursuant to section 489.128(1), the statute is not applicable and the Agreements are enforceable. Further, Incident argued that if some of the contracted-for services required a license, then those portions of the Agreements should be severed, and Incident should be awarded damages for the services it performed that did not require a contractor's license.

After conducting a hearing, the trial court entered final orders granting

4

the Associations' amended motions for summary judgment. In doing so, the court found that under section 489.128(1), the Agreements were unenforceable because the contracted-for scope of work and the work completed by Incident required a building contractor's license, which Incident did not possess.

The trial court noted that under section 489.105(3), "contractor" is defined as a (1) "person who, for compensation, undertakes to, submits a bid to, or does himself or herself or by others construct, repair, alter, remodel, add to, demolish, subtract from, or improve any building or structure, including related improvements to real estate, for others," and (2) "whose job scope is substantially similar to the job scope described in one of the paragraphs of this subsection," which includes the paragraph defining a "building contractor" in section 489.105(3)(b).[2]

The trial court then addressed whether Incident is a "building contractor," which is defined, in part, as follows:

> "Building contractor" means . . . a contractor whose services are limited to remodeling, repair, or improvement of any size building if the services do not affect the structural members of the building.

---

[2] The trial court's order provides that the "paragraph[] of this subsection" relating to a "general contractor" in section 489.105(3)(a), Florida Statutes, is not applicable. In this appeal, the parties do not dispute this determination.

5

§ 489.105(3)(b).  The trial court noted it was undisputed that Incident's services did not "affect the structural members of the [Associations'] building[s]" making the only issue before it whether Incident's "services are limited to remodeling, repair, or improvement" so as to make Incident's job scope substantially similar to that of a "building contractor."

Because certain words were not defined in the relevant statutes, the trial court relied on "dictionary definitions" to determine the plain and ordinary meaning of the words.  In doing so, the trial court relied on the Merriam-Webster Dictionary for definitions of "remodel," "repair" and "improve."  As reflected in the trial court's order, "remodel" was defined as "to alter the structure of"; "repair" was defined as "to restore by replacing a part or putting together what is torn or broken"; and "improve" was defined as "to enhance in value or quality: make better" and "to increase the value of (land or property) by making it more useful for humans."

After considering the dictionary definitions, the trial court concluded that each of the "Disaster Recovery Tasks" referenced in the Agreements and all services actually performed by Incident constitute a "repair" or an "improvement."  In doing so, the trial court noted that the "primary function of Incident's service proposal in this case is to make the property damaged by a natural disaster 'better' and 'restore it to a sound or healthy state.'"  Further,

6

in finding that the definition of "contractor" was satisfied, the trial court concluded: "The record establishes that Incident undertook to repair or improve a building or structure for compensation and its job scope is substantially similar to the job scope of a 'building contractor[.]'  Thus, Incident is clearly a contractor under § 489.105(3)(b), Fla. Stat."  The trial court also acknowledged that its ruling results in a "harsh outcome," but that it "must apply the applicable statutes without considerations of fairness."  Finally, the trial court concluded that Incident could not enforce the Agreements, stating:

> Here, the Court finds that a contractor's license was required for the scope of work to be performed under the Agreement[s], and the scope of work performed, and that Incident[]did not have the required license.  The Court concludes that there is no genuine dispute of material fact and there is no issue requiring presentation to a jury related to whether Incident[] was engaged in unlicensed contracting, and that it is therefore, prohibited from enforcing its claims "in law or in equity."  § 489.128(1), Fla. Stat.

Following entry of the final summary judgments, Incident moved for rehearing, which the trial court denied.  Incident's timely appeal followed.

## II.

An appellate court reviews de novo the granting of summary judgment. See Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 130 (Fla. 2000).  "In performing this task, we must view the record and reasonable inferences in the light most favorable to . . . the nonmovant."

7

Navarro v. Borges, 388 So. 3d 1044, 1046 (Fla. 3d DCA 2024). "When considering a motion for summary judgment, the trial court must determine that no genuine issue of material fact exists, and the moving party is entitled to summary judgment as a matter of law." Rahimi v. Glob. Discoveries, Ltd., LLC, 252 So. 3d 804, 806 (Fla. 3d DCA 2018) (quoting Mesa v. BMW of N. Am., LLC., 904 So. 2d 450, 453 (Fla. 3d DCA 2005)). Further, "[a] trial court's entry of summary judgment based on its interpretation of a statute is reviewed de novo." Id.; see also Ibarra v. Ross Dress for Less, Inc., 350 So. 3d 465, 467 (Fla. 3d DCA 2022) (providing that an order entering final summary judgment is reviewed de novo); Aramark Unif. & Career Apparel, Inc. v. Easton, 894 So. 2d 20, 23 (Fla. 2004) ("The construction of a statute is an issue of law subject to *de novo* review.").

**III.**

The issue for review in this appeal centers on the trial court's determination that <u>all</u> the contracted-for work and <u>all</u> the work Incident actually performed at the Associations' buildings required a building contractor's license.

In addressing whether the "Disaster Recovery Tasks" and the work by Incident require a license, the definitions of "contractor" in section 489.105(3) and "building contractor" in section 489.105(3)(b), and specific words within

8

those statutes are at issue.

The Florida Legislature "deem[ed] it necessary in the interest of the public health, safety, and welfare to regulate the construction industry." § 489.101, Fla. Stat. In doing so, the Legislature defined the term "contractor" in section 489.105(3), and enacted legislation stating that "[a]s a matter of public policy, contracts entered into on or after October 1, 1990, by an unlicensed contractor shall be unenforceable in law or in equity by the unlicensed contractor." § 489.128(1), Fla. Stat. Section 489.105(3) defines "contractor," in relevant part, as follows:

> "Contractor" means . . . the person who, for compensation, undertakes to, submits a bid to, or does himself or herself or by others construct, repair, alter, remodel, add to, demolish, subtract from, or improve any building or structure, including related improvements to real estate, for others or for resale to others; **and** whose job scope is substantially similar to the job scope described in one of the paragraphs of this subsection. . . .

(emphasis added).[3] As recently recognized by the Sixth District Court of Appeal in <u>Marlin Constr. Grp., LLC v. Bollinger</u>, 49 Fla. L. Weekly D751 (Fla. 6th DCA Apr. 3, 2024), "[t]he semicolon in the above definition separates the two prongs that must be analyzed to determine if one meets the definition of 'contractor.'" <u>Id.</u> at *2; <u>see also</u> <u>Sg 2901, LLC v. Complimenti, Inc.</u>, 323 So.

---

[3] The term "demolish" is defined within section 489.105(3) but the scope of work performed by Incident does not fall within the definition.

9

3d 804, 806 (Fla. 3d DCA 2021) (interpreting the definition of "contractor" under section 489.105(3) as requiring a two-prong analysis).

First, pursuant to section 489.105(3), the person, "for compensation" must "undertake[] to, submit[] a bid to, or does himself or herself or by others construct, repair, alter, remodel, add to, demolish, subtract from, or improve any building or structure, including related improvements to real estate, for others or for resale to others."  Second, the person's "job scope" must be "substantially similar to the job scope described in one of the paragraphs of this subsection."  Here, the "job scope" at issue is that of a "building contractor" as defined in section 489.105(3)(b) as follows:

> "Building contractor" means . . .  a contractor whose services are limited to remodeling, repair, or improvement of any size building if the services do not affect the structural members of the building.

In Conage v. United States, 346 So. 3d 594 (Fla. 2022), the Florida Supreme Court made clear that in reviewing the plain meaning of words utilized in a statute, courts cannot do so in isolation.  Instead, courts must consider "the specific context in which that language is used, and the broader context of the statute as a whole."  Id. at 598 (citation omitted).  More specifically, the Court explained as follows:

> The United States encourages us to use an approach that is often linked to a passage from our Court's decision in Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984) (quoting A.R. Douglass,

Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)). There we said that "[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction."  In practice, following this maxim often leads the interpreter to focus on a disputed word or phrase in isolation; the maxim also leaves the interpreter in the dark about how to determine whether a particular word or phrase has a clear meaning.

We believe that the Holly principle is misleading and outdated. More recently our Court has said that judges must "exhaust 'all the textual and structural clues' "that bear on the meaning of a disputed text.  Alachua County v. Watson, 333 So. 3d 162, 169 (Fla. 2022) (quoting Niz-Chavez v.Garland, --- U.S. ----, 141 S.Ct. 1474, 1480, 209 L.Ed.2d 433 (2021)).  That is because "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that the language is used, and the broader context of the statute as a whole."  Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

Viewed properly as rules of thumb or guides to interpretation, rather than as inflexible rules, the traditional canons of statutory interpretation can aid the interpretive process from beginning to end . . . .  It would be a mistake to think that our law of statutory interpretation requires interpreters to make a threshold determination of whether a term has a "plain" or "clear" meaning in isolation, without considering the statutory context and without the aid of whatever canons might shed light on the interpretive issues in dispute.

Conage, 346 So. 3d at 598 (footnote omitted).  See State v. Crose, 378 So. 3d 1217, 1234 (Fla. 2d DCA 2024) (stating that since the decision in Conage, the Florida Supreme Court's "marching orders for interpreting legislation have been clear:  to derive the meaning of statutes, we are to look to the text

11

itself, as understood in its context, not to any purported intent underlying the text"); see also Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); Biden v. Nebraska, 143 S.Ct. 2355, 2378 (2023) (Barrett, J., concurring) ("[T]he meaning of a word depends on the circumstances in which it is used. To strip a word from its context is to strip that word of its meaning."); Alachua Cnty. v. Watson, 333 So. 3d 162, 170 (Fla. 2022) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012))).

With these principles in mind, we address the trial court's determination that all the contracted-for work and all the work actually performed by Incident at the Associations' buildings required a building contractor's license. In the order under review, the trial court focused on the words "remodel," "repair" and "improve." In doing so, the trial court relied on broad dictionary definitions of those terms in isolation, without considering "the

specific context in which that language is used, and the broader context of the statute as a whole." Conage, 346 So. 3d at 598. In considering the terms in their "specific context" and not in "isolation," we disagree with the trial court's determination that a building contractor's license is necessary for the undisputed scope of work completed in six of the seven "Disaster Recovery Tasks" labeled here between the parties as: water damage mitigation; general dehumidification; structural dehumidification; disposal of materials off property location; anti-microbial application; and mold remediation, as necessary.[4] Stated differently, we find the words "remodel," "repair" and "improve" within this particular statute are tethered to the words "building or structure." When read in the appropriate context, these terms are tied directly to the buildings or structures themselves.

Here, we find these six contracted-for tasks are not tethered to the Associations' buildings or structures, as contemplated by the statute. While these contracted-for tasks relate to the buildings and are to be performed within the buildings, they do not involve the physical buildings or structures themselves. When the statute is considered as a whole, it would be absurd to interpret it as requiring a building contractor's license to lay plastic

---

[4] As stated earlier, mold remediation is addressed in a separate statute, and it is undisputed that Incident did not ultimately perform any mold remediation services at the Associations' buildings.

13

sheeting, plug in electric fans to dry out a wet building, to apply anti-microbial solutions for sanitation and to dispose of materials.

We also recognize the arguments raised in the amicus brief submitted by the Restoration Industry Association ("RIA"), an established trade association for the disaster remediation and cleaning industry. In its brief, RIA contends the trial court's broad interpretation of the statute would have a severe and draconian impact on the restoration industry not intended by the Legislature. Specifically, it would impose a barrier to entry—requiring a building contractor's license—for basic cleaning services or water extraction or mitigation activities, which is not textually supported by the plain language of the statute. We agree.

If we were to accept the trial court's ruling as to these six tasks and related services, practically any work performed for a homeowner for compensation would require a building contractor's license. For example, if a homeowner hired someone for compensation to clean their home, and during the cleaning process, the individual scrubbed the toilets and vacuumed and cleaned the floors, the first prong of section 489.105(3) would be satisfied because this process resulted in the "subtract[ion]" of dirt and dust from the building. The second prong would also be satisfied because the cleaning resulted in an "improvement" to the building. Likewise, if this

14

same individual sprayed the counters with antibacterial spray, the statute would be satisfied because the disinfectant was technically "add[ed] to" to building, resulting in an "improvement" to the building. An even more extreme example would be if a homeowner hired someone to hang air fresheners throughout their home. The first prong would be satisfied because the air fresheners were technically "add[ed] to" the building. The second prong would also be satisfied because the introduction of a pleasant fragrance to the interior space resulted in an "improvement" to the building. Put simply, requiring a building contractor's license for applying sanitizers or conducting any of the above-referenced activities would result in an absurd reading of the statute that cannot logically stand. See Biden, 143 S.Ct. at 2379 ("Context also includes common sense, which is another thing that 'goes without saying.'"); State v. Atkinson, 831 So. 2d 172, 174 (Fla. 2002) ("A basic tenet of statutory construction compels a court to interpret a statute so as to avoid a construction that would result in unreasonable . . . or absurd consequences."); Amente v. Newman, 653 So. 2d 1030, 1032 (Fla. 1995) ("If possible, the courts should avoid a statutory interpretation which leads to an absurd result."); Brock v. Garner Window & Door Sales, Inc., 187 So. 3d 294, 295 (Fla. 5th DCA 2016) (stating courts "are duty-bound to avoid an absurd, illogical or unreasonable construction of a statute").

15

That said, we focus on the other "Disaster Recovery Task[]"—"structural removal of [a]ffected substrates" and the scope of work performed by Incident under that task at the Associations' buildings. Here, the record reflects that certain materials that were permanently affixed to the Associations' buildings were removed by Incident. For example, Incident removed unsalvageable or damaged drywall, ceiling materials, cabinetry, carpets, vinyl plank tiles and the popcorn texture from the ceilings. We recognize that unlike applying sanitizers, detaching and disposing of a kitchen cabinet, for instance, is an activity which might arguably require a license.

In this case, both parties provided competing interpretations of the services undertaken within this job scope. They also provided conflicting analysis on whether, in the industry, some of these services affected the structure of the building and whether these services fall within the definition of "building contractor" pursuant to the statute. Based on our independent review of the record, we conclude there are genuine issues of material fact as to whether the scope of work the parties have labeled "structural removal of [a]ffected substrates" and the removal of materials affixed to the buildings fall within the scope of work performed by a "building contractor," thus requiring a building contractor's license. As such, these issues bar entry of

16

final summary judgment as to that work and the issues must be submitted to a trier of fact for determination. See Mobley v. Homestead Hosp., Inc., 291 So. 3d 987, 990 (Fla. 3d DCA 2019) ("The existence of a genuine issue of material fact precludes summary judgment."). We therefore reverse the orders entering final summary judgment in favor of the Associations and remand for further proceedings consistent with this opinion.[5]

Reversed and remanded for further proceedings.

---

[5] As we are reversing the orders under review and remanding for further proceedings consistent with this opinion, we decline to address in the first instance (1) whether section 489.128(1) completely bars an unlicensed contractor from recovering under a contract even if only a portion of the work performed requires a contractor's license; and (2) whether, based on the Agreements' severability provisions, it is permissible to sever from the Agreements those portions relating to services requiring a contractor's license, thereby allowing recovery for services not requiring a contractor's license.

**Incident365 Florida, LLC v. Ocean Point V Condo. Ass'n, Inc., et al.**

**3D22-2239, 3D22-2240 & 3D22-2241**

SCALES, J., concurring.

I concur in the opinion and write only to discuss severability of the parties' disaster mitigation contracts, an important issue that remains unadjudicated in this case and appears to be one of first impression in Florida.[6]

In the challenged judgment, the trial court determined, as a matter of law, that *each* of the "Disaster Recovery Tasks" provided by Incident under the parties' disaster mitigation contracts constituted a "repair" or an "improvement" to the Associations' "building[s] or structure[s]" as contemplated by sections 489.105(3) and 489.105(3)(b) of the Florida

---

[6] The parties cite several cases in which the severability issue is tangentially mentioned. See Earth Trades, Inc. v. T & G Corp., 108 So. 3d 580 (Fla. 2013); ABA Interior Inc. v. Owen Grp. Corp., 338 So. 3d 264 (Fla. 4th DCA 2022); Vacation Beach, Inc. v. Charles Boyd Constr., Inc., 906 So. 2d 374 (Fla. 5th DCA 2005); Sterner v. Phillips, 721 So. 2d 450 (Fla. 5th DCA 1998). None of the cited cases, though, squarely adjudicates the issue of whether – in light of section 489.128(1) of the Florida Statute's language prohibiting the enforcement of contracts entered into by an unlicensed contractor – a severability provision contained in an otherwise unenforceable contract would allow an unlicensed contractor to enforce provisions of a contract for work not requiring licensure.

18

Statutes, such that *each* task could be performed only by a licensed building contractor. Thus, the trial court did not reach, or otherwise address, Incident's alternate argument that, pursuant to the contracts' express severability provisions,[7] the trial court should sever those tasks requiring licensure (i.e., the contracts' unenforceable provisions) from the contracts, permitting Incident to enforce the contracts as to those tasks not requiring licensure.

We have now reversed the trial court's legal determination as to all but one of those tasks, concluding that because these tasks are not sufficiently tethered to the Associations' "building[s] or structure[s]" as contemplated by sections 489.105(3) and 489.105(3)(b), such work did not require Incident to possess a building contractor license. Because we have determined that a fact issue exists as to whether the remaining task –"structural removal of effected substrates" – requires licensure, the thorny issue of severability remains.[8]

---

[7] The contracts' severability provisions read as follows: "**6. Administrative Provisions . . .** (g) **Severability.** If any provision of this Agreement is deemed unenforceable, the remaining provision shall remain in full force and effect."

[8] Indeed, the severability issue is mooted only if it is ultimately determined that the remaining task does not require licensure. If, however, it is determined that the remaining task does require licensure, then Incident can

19

In its appeal, Incident argues that this Court should reach and decide the severability issue in the first instance. We have declined Incident's invitation to do so.[9] See Akers v. City of Miami Beach, 745 So. 2d 532, 532 (Fla. 3d DCA 1999) ("Because the trial court based its judgment solely on [a different basis] and this court should not ordinarily decide issues not ruled on by the trial court in the first instance, we reverse the summary judgment and express no opinion as to the legal merits of appellee's alternative ground at this time.").

On remand, for purely practical reasons, the trial court may wish to adjudicate the legal issue of severability before conducting proceedings on the fact issue we have identified in this opinion (i.e., whether the contracts' "structural removal of effected substrates" task constitutes a "repair" or an "improvement" to the Associations' "building[s] or structure[s]" as contemplated by sections 489.105(3) and 489.105(3)(b) so as to require a building contractor license), and any attendant fact issues that may derive therefrom. Indeed, the outcome of the trial court's severability determination might affect settlement negotiations, jury instructions and the verdict forms.

---

enforce the contracts for the other tasks only if the contracts' severability provisions are enforceable.

[9] See footnote 5 of majority opinion.

20